783 So.2d 423 (2001)
STATE of Louisiana
v.
Russell ELLWOOD.
No. 00-KA-1232.
Court of Appeal of Louisiana, Fifth Circuit.
February 28, 2001.
*424 Richard P. Ieyoub, Attorney General, James L. Piker, Assistant Attorney General, Department of Justice, Criminal Division, Baton Rouge, Louisiana, for plaintiff/appellee.
James A. McPherson, McPherson & Schillesci, New Orleans, Louisiana, for defendant/appellant.
Panel composed of Judges SOL GOTHARD, SUSAN M. CHEHARDY and WALTER J. ROTHSCHILD.
GOTHARD, Judge.
Defendant, Russell Ellwood, was charged by indictment on March 23, 1998, with two violations of second degree murder in violation of LSA-R.S. 14:30.1. Count one charged Ellwood with the murder of Delores Mack, and count two charged Ellwood with the murder of Cheryl Lewis. On April 9, 1998, defendant was arraigned and entered a plea of not guilty on both counts. Approximately one year later, on March 2, 1999, the state entered a nolle prosequi as to count one of the indictment regarding Delores Mack. The indictment was also amended to allege that Cheryl Lewis was murdered "on or between January 31, 1993 and February 9, 1993". With his attorney present, defendant was arraigned on the amended indictment on April 9, 1998. At that time, defendant pled not guilty to the charge of second degree murder of Cheryl Lewis.
Because of extensive pre-trial publicity, the trial court granted defendant's motion for a change of venue from St. Charles Parish to Lafayette. A three day trial began on June 8, 1999, which concluded in *425 a unanimous jury finding that the defendant was guilty as charged. On August 17, 1999, defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant filed a timely motion for appeal, which was granted by the trial court.

FACTS
On February 2, 1993, Cheryl Lewis was reported missing by her mother, Lillian Lewis. Three witnesses testified that they had seen Cheryl Lewis, prior to her disappearance, either with or in the proximity of defendant Russell Ellwood. On February 21, 1993, the body of an African-American woman was found off of Highway LA 3160 in Hahnville, Louisiana. The victim had been stripped naked and submerged in a canal off the side of the road. Fingerprints identified the body as that of Cheryl Lewis.
An autopsy and a toxicological examination led to the conclusion that the victim drowned; however, she was alive, but unconscious, when she hit the water. Although toxicology tests revealed the presence of cocaine in the victims's body, the drug was not the cause of death. Further tests placed the date of death between February 1 and February 3, 1993.
Almost exactly one year after the victim had been reported missing, defendant was discovered in his car by two off-duty St. Charles Parish Deputies, on the same desolate stretch of road approximately one mile from where the victim's body had been discovered. The car was dark, but apparently occupied by a driver. The deputies decided to investigate. After several attempts, the deputies got the driver, who was partially undressed, to exit the vehicle. The driver produced a valid Louisiana driver's license that identified him as "Russell Ellwood." Ellwood told the deputies that he was there to change the oil and brakes in his car, and consented to a search of his vehicle. The deputies, however, did not find motor oil, oil changing supplies, oil filters, or brake pads in Ellwood's vehicle. Ellwood's vehicle also did not contain the type of artificial lighting that would have been necessary to make those types of mechanical repairs in an unlit area at night.
Subsequently, a Serial Crime Task Force was originated to investigate the murders of several prostitutes in the New Orleans area. In May of 1995, while investigating the murder locations of several victims for the Task Force, Detective Phillip Ramon of the Jefferson Parish Sheriff's Office was informed by a St. Charles Parish Deputy that a "suspicious person", identified as Russell Ellwood, had been stopped in the area of one of the murder sites. Based on the information provided to the Task Force by the St. Charles Parish Sheriff's Office, defendant became a suspect in the investigation.
On July 23, 1997, Colonel Walter T. Gorman of the Jefferson Parish Sheriff's office, traveled to Sebring, Florida, with other members of the Serial Crime Task Force for the purpose of conducting interviews with defendant. Defendant had previously moved to Sebring to "develop a relationship with (his) father". After being advised of his rights, defendant gave several statements to the police over a period of three days. These statements were tape recorded and later transcribed. During the course of the interviews, defendant admitted to being involved with over 100 prostitutes in his lifetime. Defendant also admitted that he had engaged in significant drug use, and that he had a propensity for "black females".
On August 4, 1997, just a few days after the interviews had been concluded, defendant was arrested for purchasing cocaine from an undercover officer in Sebring, *426 Florida. As a result, he was incarcerated for 85 days. According to testimony offered at trial, defendant made a number of statements to fellow inmates regarding prostitutes he had killed in Louisiana. One of these inmates, Stan Hill, testified at trial that defendant had described to him in graphic detail how he would take prostitutes to remote areas, overdose them, choke them, and "drag them out of his taxi naked". Defendant admitted to police in a taped statement that he had indeed made the statement to Stan Hill.
The defendant was ultimately placed on probation for the Florida cocaine charge and moved to Canton, Ohio, to work for his brother. The Task Force conducted a second round of interviews with defendant in Ohio. Ron Camden, a 27-year veteran of the Cincinnati Police Department Homicide Squad, and someone whom defendant referred to as "an associate advisor of mine," was also present. At that interview, defendant initially denied making statements to Stan Hill. However, when Hill's taped statement was played for defendant, defendant said in response to various points of Hill's statement, "yep, yes, yes, right". Defendant finally admitted to Camden, in a taped statement, that he had made the statement to Stan Hill.
Ultimately, defendant confessed to Camden that he had taken a black female, put her in his car, taken her down the road, and "put her in the water". Defendant refused to allow this statement to be taped. Later, defendant denied to Camden that he had made the statement at all.
In January 1998, defendant voluntarily returned to Louisiana from Ohio, and was subsequently arrested for the murders of Delores Mack and Cheryl Lewis.
On appeal, defendant argues the evidence presented at trial is insufficient to sustain a conviction of second degree murder because the State failed to prove that Russell Ellwood killed Cheryl Lewis. Defendant complains that the State's case was based solely on unreliable circumstantial evidence as there was no physical evidence linking him to the crime. Further, defendant implies that the credibility of certain witnesses called against him is at issue. In particular, defendant implies that the "jailmates" and "incarcerated former prostitutes and former drug dealers" called to testify against him lacked credibility.

ANALYSIS
On a challenge of the sufficiency of the evidence, the standard of review is set out by the Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In Jackson, the Supreme Court held that the reviewing court must, "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. The standard of review as set forth in Jackson is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt". Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789. The holding of Jackson is reiterated in State v. Mussall, 523 So.2d 1305, 1308 (La.1988), in which the Louisiana Supreme Court held that the reviewing court must ask whether a hypothetical rational trier of fact, interpreting al of the evidence in favor of the prosecution, could have found the essential elements of the crime beyond a reasonable doubt. In the conclusion of its discussion, the Mussall court said:
Thus, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. As Professor Wright observes, the important points are that "the court is not *427 to substitute its judgment of what the verdict should be for that of the jury, but at the same time the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have reasonable doubt."
Id. 523 So.2d at 1311.
Also, in State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291, 1293, the Louisiana Supreme Court held:
The rational fact finder standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), for reviewing the sufficiency of evidence allows for an appellate court to impinge on `the actual fact finder's discretion ... only to the extent necessary to guarantee the fundamental protection of due process of law.' State v. Mussall, 523 So.2d 1305, 1310 (La.1988) (footnote omitted). Given this limited purpose, the Jackson standard does not serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the fact finder at trial. State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983).
Further, when a case is prosecuted on circumstantial evidence, every reasonable hypothesis of innocence must be excluded assuming every fact to be proved that the evidence tends to prove. LSA-R.S. 15:438; State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78. The requirement of LSA-R.S. 15:438 does not establish a standard separate from the Jackson standard, but rather provides a helpful methodology for determining the existence of reasonable doubt. State v. Burrow, 565 So.2d 972 (La.App. 5 Cir. 1990), writ denied, 572 So.2d 60 (La.1991). When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982).
The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. Where there is conflicting testimony about factual matters, the resolution of which depends on a determination of credibility of the witnesses, this is a matter of the weight of the evidence, not its sufficiency. State v. White, 472 So.2d 130, 132 (La.App. 5 Cir. 1985). The credibility of witnesses will not be re-weighed on appeal. State v. Rowan, supra. "[T]he Jackson standard does not serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the fact finder at trial". State v. Juluke, supra; State v. Hotoph, 99-243 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045.
Defendant was convicted of second degree murder. Second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1A(1); State v. Barnes, 98-932 (La.App. 5 Cir. 2/10/99), 729 So.2d 44, 46, writ denied, 99-1018 (La.9/17/99), 747 So.2d 1099. Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act". LSA-R.S. 14:10(1). Specific intent may be inferred from the circumstances and actions of the defendant. State v. Lewis, 98-672 (La.App. 5 Cir. 3/10/99), 732 So.2d 556, 559; State v. Patterson, 99-994 (La.App. 5 Cir. 1/25/00), 752 So.2d 280.
January 31, 1993, was the last date that Cheryl Lewis, a drug user and known prostitute, was seen alive by her family. *428 At trial, the victim's mother testified that after Ms. Lewis had attended the birthday party of her daughter, she reportedly left at 2:30 in the afternoon, but failed to return that day. Ms. Lewis' mother, Lillian Lewis, became alarmed when Cheryl had not returned home by February 1, 1993, and made an unsuccessful attempt to locate her. On February 2, 1993, Lillian Lewis filed a missing persons report on her daughter. Ms. Lewis testified that Cheryl Lewis "did unpleasant things" to obtain drugs. However, Ms. Lewis was concerned for her daughter's safety because Cheryl had left behind an uncashed monthly SSI check when she disappeared. On cross-examination, Lillian Lewis testified at trial that she never saw Russell Ellwood with her daughter.
At the trial, three witnesses testified that they had seen defendant either with Cheryl Lewis, or in the area near Cheryl Lewis, prior to her disappearance. Denise Sanderst[1] was a lifelong acquaintance of Ms. Lewis. Ms. Sanders resided in the Bridge City area at the time of Lewis' disappearance, and testified that she saw Lewis three days prior to the time that she was reported missing. Cheryl Lewis had asked Sanders at that last meeting if she could "hustle" (sell drugs) with her. When Sanders refused this request, Lewis then indicated to Sanders that she wished to obtain drugs for herself. Ms. Sanders instructed Cheryl Lewis to go to the convenience store to buy a pack of cigarettes, while she went to get the drugs. Sanders testified that as she crossed the highway, she heard a car horn sound and saw defendant pass in his car. Sanders said she withheld this information from police at the time because she was a drug dealer.
The second witness who placed Cheryl Lewis with defendant prior to the disappearance was Antoinette Holmes[2]. Holmes testified that she had known Cheryl Lewis from "being in the neighborhood from where I married". Holmes last saw Lewis at a Time Saver by the Huey P. Long Bridge in Bridge City two weeks before she was reported missing. Lewis was standing between two parked cars having a conversation with one of the drivers in the cars. Holmes recognized one of the car's occupants as "a gentleman that... frequently come through the drug area and get drugs and look for a lady to do drugs with, a prostitute, so far, and that I've actually done drugs with myself'. In a photographic lineup, Holmes picked out defendant as the man to whom Lewis was speaking, and also as a man that she "had gotten loaded with, smoke drugs with".
Winevear Henry[3] was Cheryl Lewis' cousin-in-law, and also knew Lewis "from the street drugging". The last time she saw Cheryl Lewis was at a hotel off of Highway 90 in Avondale, Louisiana. At the *429 time, Lewis was with a man that Henry later identified from a photo lineup as the defendant. Lewis had indicated to Henry that she and the defendant were heading down the road toward Boutte, and asked Henry if she wanted to go with them. Boutte was the same general area where victim's body was ultimately found. Henry declined the invitation. Henry testified that she did not come forward with this information earlier because she was "running from the law at the time". At trial, in response to the alleged sightings of the victim and defendant together, defendant testified that he did not know Cheryl Lewis.
On February 21, 1993, Deputy Darwin Grabert was working in the Crime Scene Division of the St. Charles Sheriff's Office, where his duties included securing photographs, evidence and fingerprints. On the morning of February 21, 1993, at approximately 8:28 a.m., Grabert acted in his capacity as a crime scene technician, by traveling to an area located on LA 3160 in Hahnville, Louisiana. He describes LA 3160 as an area devoid of homes and street lighting. When Grabert arrived on the scene, he observed some police units and the marking of a body. He proceeded to the area, and took his camera out in an effort to search for evidence at the scene. Deputy Grabert testified that he did not find anything [evidence] in the immediate area. The body of the victim was in the canal lying face down, a short distance from the canal bank. Once the body of the victim was pulled from the water, it was determined that the victim was a female. The victim was nude except for a pair of socks. Deputy Grabert testified that there were no means of transportation in the area which suggested how the body got there. At the crime scene, Grabert secured skin from the victim's right hand and had it processed for fingerprints. The victim was subsequently identified as Cheryl Lewis.
On February 22, 1993, Dr. Susan M. Garcia, a forensic pathologist employed by the Jefferson Parish Coroner's Office, performed the autopsy on Cheryl Lewis. She testified that the decedent was found in a moderate to slightly advanced stage of decomposition, floating nude and face down in the water, which indicated that the victim died an unnatural death. Dr. Garcia examined the victim for obvious causes of death, such as gunshot wounds, blunt trauma, or stabbing, but found none. In an internal examination of the victim, Dr. Garcia found no evidence that the victim had been strangled or that something had been put around her neck. Dr. Garcia left the cause and manner of death undetermined, pending further tests on her part and the toxicological examination of fluids taken at the time of the autopsy.
After all test results were received, Dr. Garcia concluded that victim was alive, but unconscious, at the time she was put into the water, and that the immediate cause of death was drowning. The formal conclusion of Garcia's report was that the victim had died of asphyxia due to drowning.
Dr. Garcia also concluded from the toxicological examination that the decedent tested positive for cocaine, and had a cross-reaction with amphetamines. However, Dr. Garcia testified that she was certain beyond a reasonable doubt that the victim's death was not the result of a cocaine overdose. Dr. Garcia reiterated her expert opinion that the victim was alive, but unconscious, when she hit the water.
Upon cross-examination, Dr. Garcia testified that she was not able to estimate the date of the victim's death, and gave a range from between a week prior to discovery to "upwards of one month or so." However, as she considered Dr. William *430 Marvin Bass, Ph. D., a forensic anthropologist, to be one of the nation's foremost authorities in that area, Dr. Garcia recommended to the Jefferson Parish Sheriffs Office that Dr. Bass be associated with the case to determine the date of death.
At trial, after an examination by both the State and defendant, the court qualified Dr. Bass as an expert in the field of forensic anthropology. Dr. Bass stated that, in January 1998, he was contacted by Lieutenant Steve Buras of the Jefferson Parish Sheriffs Office regarding the Cheryl Lewis case. After initial contact was made, Lt. Buras brought crime scene photos, an autopsy report, and a temperature reading from the general area where the victim was found to Dr. Bass in Knoxville, Tennessee. Based upon crime scene photographs, Dr. Garcia's autopsy report, and forensic methodology, Dr. Bass concluded that the victim had been deceased for 18 to 20 days at the time that her body was discovered. This would have placed the date of the murder between February 1, 1993 and February 3, 1993. Defendant testified at trial that he was in New Orleans between January 31, 1993 and February 9, 1993.
Almost exactly one year after Cheryl Lewis had been reported missing, Sergeant Boyd Frickey, a patrol sergeant with the St. Charles Parish Office, was driving down the same desolate stretch of highway where Cheryl Lewis' body had ultimately been discovered. Sgt. Frickey was off duty at the time, having just completed a paid security detail with Officer David Chaisson. Both officers testified at trial. According to their testimony they were on their way home when they passed a cab on the side of the road, which was occupied by a driver. The car was parked approximately one mile from where Cheryl Lewis' body had been discovered. Frickey and Chaisson decided to investigate.
After several attempts to get the driver to exit the vehicle with use of the patrol car's PA system, the officers were finally successful. The driver appeared to be partially undressed as he left the vehicle. He produced a valid Louisiana driver's license which identified him as Russell Ellwood. Ellwood told Sgt. Frickey that he was there to the change the oil and brake fluid in his cab. With Ellwood's consent, Frickey and Chaisson searched Ellwood's cab, but Frickey did not find any supplies in the trunk to change oil or brakes. A search of the interior of the cab revealed a brown medicine bottle and a spoon and some tools on the floorboard.
Ellwood was not issued a citation as a result of this stop. However, Sgt. Frickey filled out a field interview card to document the incident, and Officer Chaisson took pictures of Ellwood's vehicle to document the contents. The pictures showed that Ellwood's trunk did not contain motor oil, oil changing supplies, oil filters or brake pads. Ellwood's cab also did not contain artificial lighting which would allow one to make those types of mechanical repairs.
In May 1995, at the behest of the Federal Bureau of Investigation, a Serial Crime Task Force was formed to investigate a series of murders of African-American drug-using prostitutes which occurred between 1991 and 1995. The focus of the task force was a sixty mile radius that included five parishes. Detective Philip Ramon of the Jefferson Parish Sheriffs Office was assigned to the task force from between May of 1995 and March of 1998.
At trial Ramon testified that he traveled to each of the murder sites subject to the task force investigation, for the purpose of obtaining Global Positioning System coordinates. While at one of the sites, a St. Charles Parish Officer stopped Ramon to ask what he was doing. When Ramon *431 explained his purpose for being there, the officer remarked that a suspicious person was discovered there, and informed Ramon of the incident involving Russell Ellwood. Consequently, Ellwood became a suspect in the investigation.
Another member of the task force, Colonel Walter T. Gorman of the Jefferson Parish Sheriff's Office, Criminal Investigations Division, Crimes Against Persons Section, testified at trial. He stated that on July 23, 1997 he traveled to Sebring, Florida, in order to approach defendant for the first time in reference to the investigation, based on information developed by members of the task force. He was accompanied by Detective Murray from the Sebring, Florida police department. At 8:00 a.m., Gorman and Murray went to Ellwood's apartment. Gorman advised defendant that he was with the Jefferson Parish Sheriff's Office, and that he was in Sebring, Florida investigating a series of homicides that occurred in Louisiana.
In Gorman's opinion, the defendant was not surprised by the visit. In fact, Sgt. Olga Fourroux, of the St. Charles Parish Sheriff's Office who was also present, testified that defendant told her that he, "dreamt the police were coming to get him because of the serial murders". Defendant picked up several items that he wanted to take with him to the interview and accompanied Gorman, without protest, to the Highland County Sheriff's Office.
After being advised of his rights, defendant gave several statements to the police over a period of three days. These statements were tape recorded and later transcribed.
Gorman asked defendant whether he had ever been in the area where the bodies, subject to the task force investigation, were dumped. Defendant's answer was, "I realized that I had actually been sleeping in my taxicab in the exact areas of the killer's body-dumping ground, especially on the I-55 by the boat launch". Gorman asked defendant if he interacted in any form or fashion with prostitutes. Defendant indicated that he did not want prostitutes in his cabs. After defendant made the statement regarding prostitutes, however, he later made an admission to Gorman that he had, in fact, been involved with a number of prostitutes. Defendant told Gorman that in regard to the number of prostitutes he had been involved with, "I'd say it's over 100 my entire life". Defendant admitted to Gorman that he had engaged in cocaine use, crack use, LSD use, and IV drugs as well. But he denied that he was presently doing drugs. He also admitted to Gorman that he had a propensity for "black females".
Gorman testified that, at one point in the interview, defendant indicated to Lt. Sue Rushing that he felt he could not leave. In response to this, Gorman led defendant out of the police station and said, "You can go. I don't want you to feel like you can't go. There's the outside. You are outside. Go". Minutes later, defendant walked back inside the police station and said, "I don't know about the rest of y'all, but I'm going back in".
Over the course of the three day interview, defendant also met with Lt. Stacy Phillips of the Jefferson Parish Sheriff's Office. Lt. Phillips asked defendant specific questions regarding the deaths of Cheryl Lewis and other victims whose murders were being investigated by the task force. Defendant denied any involvement in those murders.
On August 4, 1997, just a few days after the interviews had been concluded, defendant was arrested for purchasing cocaine from an undercover Highland County Sheriff's Deputy. As a result, he was incarcerated for 85 days. While incarcerated, *432 defendant made a total of 21 requests to speak with Detective Sharon Glisson of the Highland County Sheriff's Office. Glisson had been tangentially involved in the interviews conducted with defendant a few weeks prior, but had not personally conducted any of the interviews herself. Glisson testified that she responded to defendant's request for a meeting, and saw defendant on August 11, 1997. At that time she advised defendant of his rights. Defendant told Glisson that he gave untruthful answers in his interview with Lieutenant Stacy Phillips.
During the time of his incarceration, defendant also allegedly made certain statements to fellow inmates, who testified at trial.
Charles Stuart[4] first came into contact with defendant in a correctional facility in Kansas while both were incarcerated there. Stuart testified that defendant told him that he was a suspect in a murder, but that they wouldn't be able to convict him on "any but three". During a fight between defendant and another inmate, Stuart testified that he heard defendant say, "I'll kill you just like I did them other n_____".
In regard to defendant's attitude toward prostitutes, Stuart testified that the defendant told him, "every dead crack whore was a good start". Finally, Stuart testified that the defendant told him he was, "out with a prostitute shooting dope and I guess she wigged out and he left and the girl ended up dead".
Layman Ray, Jr.,[5] was incarcerated with defendant at the Highland County correctional facility. Ray testified at trial that defendant told him while in jail that he was accused of murders in Louisiana. Defendant also reportedly told him that, if they convicted him on any, "it would be like three". When asked at trial if defendant had provided any details regarding any of the murders, Mr. Ray testified, "(h)e told me he was doing drugs with this black girl and he had drovewhen he was driving a taxi. And he had drove to a waterfront area under a bridge embankment there close to the water, and that he had killed one there". Ray further testified that he overheard another inmate ask defendant why he killed the girl. Immediately thereafter, during a fight with the same inmate who asked the question, he heard defendant say, "Yeah, I killed the n_____ bitch ... I'll kill you too".
Stan Hill[6] was incarcerated with defendant at the Highland County Correctional Facility in Sebring, Florida. Hill testified at trial that the defendant had told him about, "selling cocaine, being a taxi driver, and giving prostitutes rides in his taxicab, and injecting them with a heroin and cocaine mix". When asked if defendant explained why he did this, Mr. Hill stated that defendant said he would assist the victim in administering drugs. Then he would take the victim out to a secluded *433 area, park the cab and get into the back seat. He would then inject the victim with more drugs and, if the victim did not die from an overdose, he would choke her until he was certain she was dead. Defendant also stated that he would then sexually assault the victim and discard the body before leaving the scene.
Steven Michael Bussiere[7] was incarcerated with defendant at the Highland County Correctional Center in Sebring, Florida in July 1997. Bussiere testified defendant claimed that he was wanted "for approximately the deaths of 60 people in Louisiana". When pressed for details about one of the incidents, Bussiere recounted a similar factual scenario as that presented by Hill. However, his account was specific to one incident which involved a "petite, short haired, black female". Further, the defendant described the incident as occurring on a "long, narrow, two-lane road with a body of water on one side or the other, or both sides".
Bussiere also testified that one afternoon he observed defendant, who was laying down in his cell and saying, "I'm guilty, I'm guilty, I'm guilty, but through the Lord Jesus Christ, I will be innocent". When Bussiere asked defendant what he was referring to, defendant indicated he was talking about murders for which he was wanted in the State of Louisiana. Finally, Bussiere testified that defendant told him, "that the people he was killing was nothing but prostitutes".
Dianne Gilliam[8], a former prostitute, testified that she knew defendant from her days soliciting sex on Airline Highway. She was able to point out the defendant at trial. She testified that she met Ellwood when he picked her up at the London Lodge Motel on Airline Highway. Gilliam testified that she told defendant that if he waited until after her "date" with a client, the two of them could "go to get a hotel room, get high, party". The two of them then went to purchase drugs. On the way back to the hotel room, defendant turned off the road, presumably to do a puff of cocaine off of a pipe. Gilliam said that defendant stopped the car, at which time he began "severely beating me and tearing at my clothes and strangling me". When the victim was unable to breath, defendant hit her in the head with a knife that was on the floor, and she passed out.
Gilliam testified that when she awoke, she was in a pool of blood in a wooded, unfamiliar area. She was transported by a passing motorist to the London Lodge Motel on Airline Highway. Gilliam did not report the incident to the police because she felt that no one would believe her since she was a prostitute. The incident with defendant occurred seven years prior to trial.
Nawassa Richmond[9] testified at trial that she had two encounters with the defendant. Richmond testified that the first time she met defendant, she was "a stripper, and ... also a prostitute on the side". Richmond was on her way to a prostitution *434 "date" on Airline Highway when the defendant pulled over and asked if she needed a ride. Richmond stated that she recognized defendant from a place she used to work years before. Richmond testified that she told defendant if he waited until after her "date" they could get a room together and buy some drugs. When Richmond came out of the hotel defendant was gone, so she started walking down Airline Highway. Soon after defendant reappeared and asked her where she was going. Defendant asked her if she wanted to get in the car. Once inside the car, defendant asked Ms. Richmond if she "got the money". Richmond testified that when she offered defendant some of the money, he grabbed her throat and said, "(n)o, that ain't enough bitch!". Defendant then pulled over to the side of the road and took all of the money. During the struggle, Richmond testified that she passed out or was knocked out. Richmond testified that when she regained consciousness, she was being forced out of the car by the Spillway. She landed face down in a mud puddle and pretended to be dead.
Richmond also testified that she had an encounter with the defendant five or six years later. She stated that she went with defendant a second time because she believed defendant was having a bad drug experience during the first incident. In the second incident, Richmond testified that she and the defendant were doing intravenous drugs together, and that she had an overdose. During her overdose, she claims that defendant grabbed her by the neck, and threw her against the tile wall, injuring her head. Richmond testified that she went to the hospital following the incident, but cannot remember what alias she used at the time. While at the hospital she made out a police report, but because of her condition in the wake of the overdose, she cannot remember what she told the police, or if she implicated defendant at that time.
Janie Stokes[10], a former prostitute, testified that she first met the defendant in either 1992 or 1993 at Snell's Gas Station in Marrero, Louisiana. She recalled seeing defendant sitting in his cab on previous occasions. One day, she went over to defendant's cab and told him that she needed a ride. Defendant reportedly bought her something to eat, and seemed to Ms. Stokes to be "a pretty good guy." In time, defendant introduced himself as Russell Ellwood. Stokes testified that defendant bought her some cocaine and that they went to Algiers, where she lived. They parked off Behrman Highway near Behrman Park. Stokes said that she smoked the cocaine. She then testified, "before I knew it, he bust my mouth wide open, and then he started beating down and beating down". She also stated that she was naked as she escaped the car and began running down the street, although she does not remember if defendant removed her clothes or if she did it willingly. She ran down the street until she came to a car with a driver in it. At that point she stated that defendant just pulled off. Ms. Stokes said that she did not report the incident to the police because she was a drug addict.
Antoinette Rainey[11] testified that she became so afraid the first time she selected *435 a photograph of defendant from a photo line-up, that she had to terminate the interview. She testified that she had seen defendant in her neighborhood and sold him "rocks" four or five times. On the last occasion that she saw defendant, Rainey testified that she had "trouble" with him. Rainey was selling drugs in Jefferson Parish near Airline Highway. Defendant tracked her down, and asked her if she had anything to sell. Rainey testified that she sold defendant six rocks for $100.00. The two started "driving around." The defendant reportedly gave two of the rocks back to Rainey, and told her to do a hit while he was driving. Rainey said at that time, defendant "hauled off and hit me". Defendant then reportedly told her to do another hit of cocaine. Rainey testified that defendant told her, "You know what I do to bitches like you? ... I kill them". Rainey testified that defendant drove them under an overpass near a warehouse, where he ordered her to continue to use more cocaine. Rainey testified that defendant forced her to perform sexual acts with him. Rainey further testified that defendant beat her while they were having sex. Rainey stated that she escaped when a truck entered the area. The incident was never reported to the police.
At the time of his testimony at trial, Ronald R. Camden had been a 27-½ year veteran of the Cincinnati Police Department, Homicide Squad. In the late 1980's, Camden met defendant during a case in which the defendant was not a suspect. From the late 80's through 1996, defendant would always stop and see Camden whenever he was in town. Camden also provided the defendant with financial assistance intermittently over the years.
In either July, August, or September of 1997, Camden received a phone call from defendant, who indicated to him that he was possibly being investigated in reference to some homicides in New Orleans. On November 7, 1997, Camden received another phone call from defendant, who asked him if he would speak to Lieutenant Rushing, the head of the task force investigating him. On November 10, 1997, Camden received a phone call from Lieutenant Rushing, who requested that he be present at an interview with the defendant in Canton, Ohio. Camden agreed. Camden testified that he was not going to be present as a police officer, but as Ellwood's friend.
On the first day of the interview, Camden confronted defendant with a transcribed statement from Stan Hill, an inmate previously incarcerated with defendant. Defendant denied having ever made a statement to Hill, and Camden suspected that defendant was lying in this regard. Ultimately, Stan Hill's transcribed testimony was read to defendant. Camden testified that defendant's response to Hill's transcribed testimony was, "(h)e really nailed me". An audio tape of Stan Hill's testimony was also played for the defendant. Camden testified that in response to different points of Hill's statement that defendant said, "yep, yes, yes, right". Defendant finally admitted to Camden, in a taped statement, that he had made the statement to Stan Hill.
After defendant admitted making the statement to Stan Hill, Camden asked defendant for details regarding some of the incidents that were described in the statement to Hill. Camden testified that at that point, there was a dispute between defendant and Lt. Sue Rushing over whether defendant could return to Louisiana. Camden said that defendant had agreed "to give her two cases in 3161" (referring to the stretch of road where murdered bodies had been found), but that Rushing had told defendant "that's not enough". Defendant insisted that they contact Colonel *436 Walter T. Gorman of the Jefferson Parish Sheriffs Office, who had conducted the first interviews with defendant.
Gorman testified at trial that, on November 25, 1997 he received a phone call from Lt. Rushing, who was interviewing defendant in Ohio. Defendant had indicated to him that he wished to return to Louisiana, and Gorman told him that this would not be possible unless defendant reduced his statements to writing. Defendant told Gorman, "I'm going to give you two, just let me come back to New Orleans".
Camden testified that at the conclusion of the phone call with Gorman, defendant slammed down the phone and spouted derogatory terms about Gorman. Camden testified that following the phone call defendant, "continually ... got out of control for a few minutes". Then defendant made the following statement:
Okay, okay, I'm willing to give you this. I took a black female. I put her in my car. I took her down the road, and I put her in the water. That's what I'm going to give you.
According to Camden's testimony, defendant repeatedly asked to be returned to Louisiana to get psychiatric help or to see his lawyer. In return, defendant indicated he would provide the investigators with information regarding murders in Louisiana. However, no promise was made to defendant.
Camden testified that defendant was asked to put his statement on tape, or give a written statement regarding what he had told Camden and Rushing about putting a body in the water, but he refused. Instead, defendant insisted that he be returned to Louisiana before he would discuss the murders.
The first interview lasted approximately 14 hours, from 1:00 in the afternoon until three o'clock in the morning. Defendant made a taped statement at the interview in which he indicated that he was being "treated fairly". Camden testified that during the interview, there were periods of 10 and 15 minute breaks. The next day, Camden asked defendant if he had given any thought to telling him and Lt. Rushing about the incident he had described the night before, but defendant denied saying anything. Camden then testified that he reminded defendant that he admitted that the police stopped him in the area where the body was found, that he was associated with the victims, and he gave a statement to Stan Hill. Camden further reminded defendant that he told Camden that he took a black female down the road in a car and "put her in the water". Again, the defendant denied making such statements.
Sergeant Olga Fourroux of the St. Charles Parish Sheriff's Office, was assigned to the Task Force at the time the defendant was interviewed in Canton, Ohio, and was present for the interviews. Sgt. Fourroux testified that during breaks from the interviews with defendant, she would bring coffee or cigarettes to the defendant. During one such break, Sgt. Fourroux testified that defendant told her, "I'm going back to Louisiana for the two overdose cases. I had a black prostitute in the car and I IV'd her. And I can't incriminate myself any more than I already have".
In January 1998, defendant voluntarily returned to Louisiana from Ohio, and was pulled over for a speeding ticket. Because of outstanding contempt of court charges resulting from defendant's prior failure to appear for traffic tickets, he was taken into custody. He was subsequently arrested for the two murders with which he was originally charged in this matter.
Defendant testified at trial. He stated that he was in New Orleans from between *437 January 31, 1993 and February 9, 1993. When questioned about the incident described by deputies Frickey and Chaisson, defendant asserted that he was parked on the side of the road to change his oil. He claimed that the deputies had failed to locate the six quarts of motor oil located in the deck lid of his trunk.
At trial, without specifically referring to each witness individually, defendant made a general statement in which he denied knowing any of the female witnesses who had testified against him. Defendant also testified that he "dated prostitutes" while he drove a cab, but that he had never beaten up any prostitutes.
When questioned about the interview with Task Force members in Florida, defendant stated that he was not surprised because he had received a phone call from a former employer two weeks prior to the visit, informing him that the police were asking questions about him.
When asked about the second interview that was conducted with him by the Task Force, defendant stated that during the interview he informed Ron Camden and Lt. Sue Rushing that he would like to talk to his attorney, Ross Scaccia. Defendant also testified regarding the second interview that, "I said almost anything in an attempt to return to New Orleans to be in the presence of my attorney, Ross T. Scaccia". With respect to his request to Lt. Rushing that he return to Louisiana, defendant offered his taped statement that such a return would be, "to prove my innocence". Defendant also offered a portion of his taped statement in which he told Lt. Rushing, "I have complete faith in you and that you will find the killers or the people that are guilty of these crimes, and that I may be of assistance to you in this investigation".
Defendant testified at trial that, while incarcerated in Florida, he explained to other inmates that he was the suspect of numerous homicides in the New Orleans area. Defendant denied confessing to any of the inmate witnesses that he was a serial killer.
To convict defendant of second degree murder, the jury would have to find that defendant killed Cheryl Lewis when he had specific intent to kill or to inflict great bodily harm. As discussed previously, the jury was presented the following trial testimony and evidence: Ron Camden testified that defendant made a statement to him and Lt. Sue Rushing during an interview that he had taken a black female, put her in his car, took her down the road and put her in the water. The victim was, in fact, found off of a deserted stretch of road, in the water. Stan Hill testified at trial that defendant had described to him, in detail, how he took prostitutes out to deserted areas, gave them an overdose of drugs, choked them, and dragged them naked out of his taxi to "lay them wherever". The defendant admitted in a taped statement that he had told this to Stan Hill. The victim was both a prostitute and a drug user, and had been found naked.
Several inmates with which defendant was incarcerated testified that defendant told them of his murderous activities in Louisiana. Some of those accounts have details which are case specific. Other evidence presented at trial establishes that the victim was murdered between February 1, and February 3, 1993, a time in which defendant admits he was in the area. Denise Sanders, Antoinette Holmes, and Winevear Henry testified that they saw the defendant either near or with the victim prior to her disappearance. In particular, Winevear Henry testified that the victim had indicated to her that she and the defendant were heading down the road toward Boutte, and asked Henry if she wanted to go with them. Boutte was the *438 same vicinity where victim's body was ultimately found.
Dianne Gilliam and Nawassa Richmond, former prostitutes, testified that in the past defendant had induced them to use drugs, attacked them, and thereafter left them stranded in desolate uninhabited areas. One year after the murder, defendant was found by police, parked approximately one mile from the murder scene, without any apparent reason for being there.
The record reflects that the jurors in this case were advised of any bias that the respective witnesses, referred to in defendant's brief, might have in testifying at trial, and apparently found these witnesses to be credible notwithstanding.
In light of evidence of defendant's multiple confessions, we find that the evidence presented at trial constituted circumstances from which the existence of the main fact may be inferred, according to reason and common experience, by the jury. Specifically, the jury accepted defendant's testimony that he was in the New Orleans area during the window of time that the murder took place, and concluded that he did have the opportunity to commit the murder. The members of the jury apparently concluded, based on testimony which they deemed credible, that defendant had been seen in several instances with or around the victim prior to her disappearance. The jury also apparently concluded, from the testimony of Dianne Gilliam and Nawassa Richmond, that the murder of Cheryl Lewis fit the modus operandi of defendant in committing his signature crime of picking up prostitutes, abusing them, and dumping them in desolate areas.
When combined with confessions of defendant, we find that the circumstantial evidence presented at trial fulfilled the standard of excluding every reasonable hypothesis of innocence. Further, we find the evidence presented at trial was sufficient under the Jackson standard to convict the defendant of the crime charged. Accordingly, we find no merit in this assignment.
The record was reviewed for errors patent, according to LSAC.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). In that review we find that during sentencing the trial court advised defendant that the prescriptive period for filing post-conviction relief was three years from the date that his sentence becomes final in accordance with LSAC.Cr.P. art. 930.8. However, an amendment to LSA-C.Cr.P. art. 930.8, effective August 15, 1999, shortened the prescriptive period from three to two years.
This Court has held that the application of the amended prescriptive period in this case would not violate ex post facto prohibitions, as the article itself does not relate to an offense or its punishment. See, State ex rel. Glover v. State, 93-2330, 94-2101, 94-2197 (La.9/5/95), 660 So.2d 1189, 1201; State v. Boles, 99-662 (La.App. 5 Cir. 11/10/99), 750 So.2d 1059, 1062. Therefore, we remand the matter and instruct the trial court to send appropriate written notice to defendant of the two-year prescriptive period for post-conviction relief in this case, and to file written proof in the record that defendant received the notice within ten days of the rendering of the opinion.
AFFIRMED AND REMANDED WITH ORDER.
NOTES
[1] Ms. Sanders was serving a 5-year sentence at the time of her testimony for distribution of cocaine. At trial, she testified that she was not offered anything from the State in return for her testimony, nor did she expect anything in return.
[2] Ms. Holmes was serving a 25-year sentence at the time of her testimony for distribution of cocaine. She testified that she was not offered anything from the State in return for her testimony, nor did she expect anything in return. Holmes also admitted to being a former prostitute. Ms. Holmes did not come forward with the information contained in her testimony until approached by police while serving her prison term. Colonel John Thevenot, JPSO, testified that Ms. Holmes did not hesitate in making a photographic identification of defendant.
[3] Ms. Henry was serving a year sentence at the time of her testimony for crime against nature. She testified that she was not offered anything from the State in return for her testimony, nor did she expect anything in return.
[4] Mr. Stuart was serving a sentence at the time of his testimony for burglary and grand theft. He testified that he was not offered anything from the State in return for his testimony, nor did he expect anything in return.
[5] Mr. Ray was serving a one-year sentence at the time of his testimony for a forged check. He testified that he was not offered anything from the State in return for his testimony, nor did he expect anything in return.
[6] Mr. Hill was serving a three-year sentence at the time of his testimony for dealing in stolen property. He testified that he was not offered anything from the State in return for his testimony, nor did he expect anything in return. Hill did testify, however, that he had initially hoped that if he cooperated with authorities that he would receive a break on his charges.
[7] Mr. Bussiere was on probation at the time of his testimony for arson in the first degree and burglary of an unoccupied dwelling. He testified that he was not offered anything from the State in return for his testimony, nor did he expect anything in return.
[8] At the time of her testimony, Ms. Gilliam was serving a 13-year sentence for carjacking. She testified that she did not receive anything in return for her testimony, and did not expect to receive anything in return.
[9] Ms. Richmond was serving a ten-year sentence at the time of her testimony for Crime Against Nature. She testified that she did not receive anything in return for her testimony, and that she did not expect to receive anything.
[10] Ms. Stokes was serving a two and one-half-year sentence at the time of her testimony for Crime Against Nature. She testified that she did not receive anything in return for her testimony, and that she did not expect to receive anything.
[11] Ms. Rainey was serving a five-year sentence at the time of her testimony for possession of cocaine. She testified that she did not receive anything in return for her testimony, and that she did not expect to receive anything.